J. Jeffrey Coughlin (013801)
**J. JEFFREY COUGHLIN PLLC**
114 S. Pleasant Street
Prescott, Arizona 86303
Telephone: (928) 445-7137
Facsimile: (866) 890-8989
j.coughlin@azbar.org
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| PAUL VAN WEELDEN AND KAREN VAN WEELDEN, husband and wife; Paul Van Weelden, as Trustee for THE VAN WEELDEN FAMILY TRUST.<br><br>Plaintiffs,<br><br>vs.<br><br>HILLCREST BANK, a Kansas banking corporation,<br><br>Defendants. | CASE NO. 2:10-CV-01833-JAT<br><br>**PLAINTIFFS' OBJECTION TO HILLCREST BANK'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** |

Plaintiffs, by and through their attorney undersigned, hereby object to Hillcrest Bank's Motion to Dismiss Plaintiff's First Amended Complaint for several essential reasons

- Injunctive relief has already been granted in this case and confirmed by the state court judge; Defendant is forum and judge shopping;

- The allegations in Plaintiffs' First Amended Complaint are specific and support all of the counts asserted;

- The First Amended Complaint contains abundantly specifically allegations and incorporates all of the 120 general allegations into each count;

- The First Amended Complaint contains more than sufficient factual allegations to support all of the counts asserted.

Plaintiffs detail the basis for their objection in the accompanying Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  FACTUAL BACKGROUND

Plaintiffs have asserted a total of 162 allegations in their First Amended Complaint.  Of those 162 allegations 152 are factual.  Rather than reasserting all of those factual allegations, Plaintiffs will identify them by number and incorporate them by reference in this objection.  The undersigned avows to the Court that allegations 1 – 3, 6 – 125, 128 – 132, 134 – 146, 148 – 160 and 162 are the allegations which Defendant asserts are "not well-pleaded".  Those allegations recite the complicated and deceptive background preceding the current litigation.  Conspicuously absent from Defendant's Motion to Dismiss is the history of the subdivision at issue and the nefarious activities which are currently being investigated by the Arizona Department of Real Estate, the United States Department of Justice, the United States Bankruptcy Court for the Western District of Missouri along with multiple lawsuits in at least five states.

Plaintiffs initially brought this complaint to stop Defendant from selling property against which Plaintiffs had secured a judgment lien.  Plaintiffs requested that the state court enter a temporary restraining order and a preliminary injunction enjoining Defendant, its officers, agents, servants, employees and attorneys and all persons in active concert or participation with them from proceeding with any trustee's sales concerning the property identified in Defendant's Notice of Trustee's Sale.  On February 5, 2010 this Court issued a temporary restraining order, stating, among other things:

IT IS HEREBY ORDERED that a temporary retraining order be issued immediately, retraining Defendant, Defendant's attorneys, officers, agents, servants, employees, and any and all other persons in active concert or participation with them from conducting a trustee's sale or otherwise foreclosing upon the property described in <u>Exhibit A</u> attached hereto and incorporated herein by this reference prior to the completion of the litigation of the above-captioned matter.

IT IS FURTHER ORDERED that, unless further extended by Order of this Court, this **Temporary Restraining Order shall remain in full force and effect pending a hearing upon and disposition of Plaintiffs' request for a preliminary injunction.** (emphasis added).

At the time Plaintiffs were preparing the Verified Complaint in this case, there were multiple judgment liens against the property which is the subject of the underlying trustee's sale. The Arizona Department of Real Estate (ADRE) was investigating the owner and developer of the property, Quintero Golf and Country Club LLC (Quintero). The Federal Deposit Insurance Corporation (FDIC) had investigated the Defendant in this case and obtained a consent order from the Defendant to cease and desist the following unsafe or unsound banking practices:

    a.    Operating with a board of directors that has failed to provide adequate supervision over and direction to the management of the Bank.

    b.    Operating with management whose policies and practices are detrimental to the Bank.

    c.    Operating with an inadequate level of capital protection for the kind and quality of assets held and/or appropriate to the risk inherent in the activities engaged in by the Bank.

    d.    Engaging in imprudent lending and lax collection practices.

    e.    Operating with an excessive level of adversely classifies loans or assets, and/or delinquent loans and/or non-accrual loans.

    f.    Failing to properly identify risk and assess the level of risk in problem loans.

    g.    Operating with an inadequate allowance for loans and lease losses for the volume, kind, and quality of loans and leases held, and/or failing to make provision for an adequate allowance for possible loan and lease losses.

    h.    Operating with inadequate liquidity and an excessive reliance on wholesale funding in light of the bank's assets and liability mix.

    i.    Operating with inadequate earnings.

At the time Plaintiffs were preparing the Verified Complaint in this case, the primary member and alter ego of Quintero, Gary McClung (McClung) was attempting to shed himself of all responsibility for soliciting tens of millions of dollars from unwary investors by seeking bankruptcy protection.  McClung developed and maintained a very close relationship with Defendant over the past two decades and, as alleged in the First Amended Complaint, was allowed significant leeway in the supervision of loan funds which Defendant provided to Quintero and McClung personally.

Based on some of the investigation Plaintiffs and others have conducted since filing the Verified Complaint in this case, Plaintiffs discovered just how close Defendant, Quintero and McClung were while investors began depositing their millions into a fraud mill.  As a result of that investigation, Plaintiffs allege in their First Amended Complaint the following additional counts:   Intentional Interference with Contract, Aiding and Abetting Negligence, Aiding and Abetting Fraudulent Misrepresentation, Civil Conspiracy.  The investigation is far from over.

Since the Verified Complaint was filed in this case, the Quintero Community Association (QCA) and several investors have sued Defendant and Quintero in Missouri for similar violations concerning Quintero's development in Arizona. Since the filing of the Verified Complaint in this case the ADRE concluded its investigation. On March 31, 2010 the ADRE issued an order summarily suspending Quintero's Public Report. ADRE found that Quintero failed to complete roads by the date stated in the Public Reports as required by A.R.S.§32-2181(A)(18) and A.A.C. R4-28-B1203. The ADRE found that the failure of the roads to be completed constituted an immediate threat to the public health, safety, and welfare warranting immediate suspension of the Public Reports. Defendant was aware that the roadways had not been completed and nevertheless, in collusion with McClung, decided to halt all funding for all construction. Defendant was aware that the roadways had not been completed and nevertheless, in collusion with McClung, loaned millions to McClung in order that its own debt service would continue. McClung and Quintero requested and Defendant agreed that various Irrevocable Letters of Credit could be cancelled even though the infrastructure was incomplete for Plaintiffs' and others' properties.

Since the filing of the Verified Complaint in this case, the United States Department of Justice (DOJ) has commenced an investigation of McClung because the bankruptcy trustee's counsel began discovering disturbing information concerning McClung's activities in the solicitation of funds for and development of Quintero.

The state court enjoined Defendant from conducting the sale as requested in the original Verified Complaint, directed counsel to confer and submit a proposed scheduling order and then issued a scheduling order to govern the activity in the case until trial of the matter to be scheduled at a scheduling conference in December 2010. Although Plaintiffs have requested

the opportunity to take various depositions of individuals employed by Defendant and who made key decisions concerning Defendant's relationship with the owner and developer of the properties which were the subject of the trustee's sale, Defendant refused to agree to make its own employees at the heart of the malfeasance available.

Plaintiffs gathered as much information as is possible about the relationship between Defendant and the owner/developer and asserted significant new allegations and counts, as above described, in their First Amended Complaint. Plaintiffs alleged the necessary elements for the above causes of action, survived Defendant's objection to Plaintiff's motion to amend the complaint and motion to dismiss in state court and filed the current First Amended Complaint in state court. Immediately, Defendant has attempted to have this Court dismiss a complaint which is more than sufficient factually to support the claims asserted and doing so for reasons previously raised and discarded by the state court.

## II.   ARGUMENTS OF LAW

### A. The temporary restraining order was issued by the state court and should remain intact until a hearing on the merits is scheduled by this Court

The state court issued a temporary restraining order, which Defendant attempted to reverse by taking a special action to the Arizona Court of Appeals. The Court of Appeals declined to exercise its jurisdiction to review the matter. Defendant has now located a new forum to review the state court decision - this Court. In the state court proceedings, Plaintiffs applied for, presented argument concerning and were issued a temporary restraining order halting the sale of property which was the subject of a scheduled trustee's sale.

### B. Plaintiff's claim for Defendant' s intentional interference with contract is factually and legally sufficient

Defendant alleges that because it was the Van Weelden Trust Plaintiff that entered into the contract with Quintero, the Van Weeldens personally are not parties to the contract. The

Van Weeldens were the trustors, trustees and beneficiaries of the trust and are certainly entitled to enforce and be bound by transactions of the trust; it is the beneficiaries who enforce the terms of the trust and for whom the trustee manages the property.

### 1. Intentional Interference with contract

A prima facie case of intentional interference requires: (1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly. *Wells Fargo v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund,* 201 Ariz. 474, 488 ¶74, 38 P. 3D 12, 26 (2002).

Hillcrest Bank claims that Van Weeldens fail to state a claim for this count because they fail to allege well-pleaded factual allegations that satisfy the last three of the five necessary elements. Allegation #128 of the FAC states there was a contractual relationship between the Quintero entities and Plaintiffs when Plaintiffs purchased land in Quintero. This is a factual statement which alleges the **existence of a contract**. Hillcrest Bank was aware of the Quintero development; it was the primary source of the funding. Every time a lot sold, Hillcrest was notified and the debt to the bank was reduced as the title company. Allegation #39 of the FAC states: "[P]ursuant to the transaction requirements, a portion of all Quintero lot sales would be paid to Hillcrest to service the loan. A smaller portion was to be used by Quintero pursuant to the guaranteed Line of Credit established by the loan with Hillcrest". This is a well-pleaded fact.

Allegation #129 of the FAC states that Hillcrest was aware of the contractual relationship between the Quintero entities and Plaintiffs when the purchase proceeds from the sale were applied to the Hillcrest loan balance. This is a factual statement which alleges the **knowledge** of

the contractual relationship on the part of the interferer. Allegation # 39, above, was incorporated by reference into the Interference with Contract count.

Allegation ##130 and 131 state Hillcrest knew that McClung had requested the letters of credit be cancelled and knew that there was infrastructure that had not been completed and with this knowledge, Hillcrest directed PDG to halt the project, thus severing Plaintiff's ability to develop or resell their land. This is a factual statement which alleges an **intentional interference inducing or causing a breach** and the damages consequent to that breach.

Allegation # 132 states Plaintiffs have been damaged as a result of Hillcrest's improper actions. This is a factual allegation which alleges **resultant damage** to the party whose relationship has been disrupted as a result of Hillcrest Bank's improper actions. It will be Van Weeldens' burden to prove the amount of damages it has sustained at the time of trial; suffice it to say, they can not sell their land to date because the infrastructure has not been completed and the Public Report has been suspended.[1]

**2. Aiding and abetting**

Hillcrest Bank raises questions as to the validity of the aiding and abetting claims. Hillcrest Bank misconstrues this claim. It is not the fact that Quintero solicited loans from Van Weeldens or that the bank provided construction funding to Quintero, it is what Hillcrest Bank, McClung and Quintero did following those events. Paragraphs 133 through 146 of the proposed amended complaint contain the factual allegations supporting the aiding and abetting claims. Hillcrest Bank is certainly entitled to raise factual disputes as to what occurred and when.

---

[1] Hillcrest Bank caused a receiver to operate the Quintero development and Golf Course pursuant to the Deed of Trust. Hillcrest Bank apparently can keep the golf course operating but not complete the infrastructure.

There are two very separate claims concerning aiding and abetting in the FAC. McClung was negligent in his management of Quintero and Hillcrest Bank knew it. Paragraphs 141 through 146 provide the detail:

> 141.    McClung actually made the misrepresentations alleged herein, failed to disclose pertinent information to Plaintiffs and failed to manage Quintero with the ordinary care a reasonable person would, he acted/failed to act for his personal gain and is responsible for the damages suffered by Plaintiffs and, because he has used Quintero as his alter ego, McClung is individually liable for his actions.
>
> 142.    Hillcrest was aware of McClung's tortuous conduct and that it would constitute a breach of his obligations to Plaintiffs.
>
> 143.    Hillcrest substantially assisted or encouraged McClung in the achievement of the breach of his obligations by only agreeing to fund the development at a level substantially below the threshold necessary to complete the project.
>
> 144.    Hillcrest substantially assisted or encouraged McClung in the achievement of the breach of his obligations because Hillcrest was aware of the financial instability of Old Standard and WULA, failed to conduct appropriate due diligence, insisted on worthless personal guarantees by McClung and his wife without requesting any financial verification of McClung's net worth and knew that McClung was in financial dire straits.
>
> 145.    Hillcrest substantially assisted or encouraged McClung in the achievement of the breach of his obligations by insisting on a significant reduction in the funding of the lines of credit and requiring McClung to be responsible for privately funding substantial portions of the development when it knew he was financially incapable of doing so.
>
> 146.    Hillcrest substantially assisted or encouraged McClung in the achievement of the breach of his obligations by halting the funding of the Quintero development, knowing that the infrastructure was incomplete in violation of the Public Report and then loaning McClung Millions more for the sole purpose of servicing the debt on an otherwise non-performing loan.

Van Weeldens have appropriately pled the facts and elements of aiding and abetting fraudulent misrepresentation. Claims of aiding and abetting tortious conduct require proof of three elements:

> (1) the primary tortfeasor must commit a tort that causes injury to the plaintiff
>
> (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and
>
> (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach. *Wells Fargo*, above, at 210, 38 P.3d at 22 (quoting Gomez v. Hensley, 145 Ariz. 176, 178, 700 P.2d 874, 876 (App. 1984)(citing RESTATEMENT (SECOND) OF TORTS § 876(b)).

Van Weeldens have pled the necessary facts to support aiding and abetting liability for fraudulent misrepresentation in paragraphs 147 through 160 of the FAC.

Contrary to Hillcrest Bank's assertion that Van Weeldens have not pled fraud with the requisite specificity, a review of paragraphs 147 through 160 in the FAC reveals the contrary. A restatement of the allegations may be helpful:

> 147. Plaintiffs re-allege paragraphs 1 through 146 as if fully set forth herein.
>
> 148. McClung made material false representations to Plaintiffs regarding the repayment of monetary obligations.
>
> 149. McClung knew these representations were false or was ignorant of their truth.
>
> 150. McClung intended for Plaintiffs to act upon these representations in the manner reasonably contemplated by lending or investing money with him and allowing him additional time for repayment.
>
> 151. Plaintiffs were unaware of the falsity of McClung's representations and relied on their truth.
>
> 152. Plaintiffs had a right to rely on McClung's representations as McClung was intimately aware of and controlled both his and Quintero's finances.

153. McClung's misrepresentations consequently and proximately caused Plaintiffs damages in an amount to be determined at trial.

154. McClung has employed Quintero for fraudulent purposes by making promises regarding repayment with the present intention not to perform the same.

155. McClung made the material false representations alleged herein, did so for his personal gain and would be responsible for the damages suffered by Plaintiffs and, because he has used Quintero as his alter ego, McClung would be individually liable for his actions.

156. Hillcrest knew of McClung's tortious and fraudulent conduct and knew that it constituted a breach of his obligations to Plaintiffs.

157. Hillcrest substantially assisted or encouraged McClung in the achievement of his fraudulent misrepresentation by only agreeing to fund the development at a level substantially below the threshold necessary to complete the project.

158. Hillcrest substantially assisted or encouraged McClung in the achievement of his fraudulent misrepresentation because Hillcrest was aware of the financial instability of Old Standard and WULA, failed to conduct appropriate due diligence, insisted on worthless personal guarantees by McClung and his wife without requesting any financial verification of McClung's net worth and knew that McClung was in financial dire straits.

159. Hillcrest substantially assisted or encouraged McClung in the achievement of his fraudulent misrepresentation by insisting on a significant reduction in the funding of the lines of credit and requiring McClung to be responsible for privately funding substantial portions of the development when it knew he was financially incapable of doing so.

160. Hillcrest substantially assisted or encouraged McClung in the achievement of the breach of his obligations by halting the funding of the Quintero development, knowing that the infrastructure was incomplete in violation of the Public Report and then loaning McClung millions more for the sole purpose of servicing the debt on an otherwise non-performing loan.

Van Weeldens have pled with specificity all the facts to support the elements of Aiding and Abetting Fraudulent Misrepresentation.  Hillcrest Bank must be misconstruing this claim.  It is not what Hillcrest Bank did during its original funding years, it is what Hillcrest Bank did when McClung and Quintero were developing and selling the properties as alleged in the general allegations along with paragraphs 147 though 160 of the FAC.

### 3.  Civil conspiracy

"For a civil conspiracy to occur two or more people must agree to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means, causing damages." *Baker v. Stewart Title & Trust of Phoenix,* 197 Ariz. 535, 542, 5 P.3d 249, 256 30 (App. 2000) (quoting *Rowland v. Union Hills Country Club,* 157 Ariz. 301, 306, 757 P.2d 105, 110 (1988)); see also RESTATEMENT (SECOND) OF TORTS § 876.  In paragraph 162, Van Weeldens alleged "Robert Sperry, Jeffrey Wheeler and Jon Forgey were all corporate officers of Hillcrest.  Each and all of these individuals agreed with McClung to accomplish an unlawful purpose, as described above or to accomplish a lawful object by unlawful means, as described above".  The FAC is replete with allegations identifying the culpable individuals at Hillcrest Bank, the unlawful purposes or the unlawful object by unlawful means by which those individuals acted and the damages they caused.  The 160 allegations incorporated into the civil conspiracy count recount a twisted, incestuous, deceptive tale of wrongdoing.  McClung was the front man soliciting the up-front money, as set forth in allegations 6-10 of the FAC:

> 6.     Prior to December 31, 2003, the Trust Plaintiff loaned Defendant Quintero Two Hundred Thousand Dollars ($200,000.00).
>
> 7.     Based upon this loan, Quintero issued the Trust Plaintiff two Revenue Producing Membership Collateral Certificates and Agreements (the "RPMs"), each representing One Hundred Thousand Dollars ($100,000.00), numbered 00052 and 00053

> respectively, dated December 31, 2003, with repayment pledged by McClung.
>
> 8. On May 24, 2004, the State of Arizona Department of Real Estate issued a Subdivision Public Report for Founders Estates Three, Quintero Golf & Country Club, Phase I, registration number DM04-048130. The subdivider identified in the Public Report is Quintero Golf and Country Club, LLC, an Arizona limited liability company.
>
> 9. On June 30, 2004, the Van Weelden Plaintiffs issued a check for One Hundred Fifty Thousand Dollars ($150,000.00) to Quintero to become Master Charter members (the "Membership"). The Van Weelden Plaintiffs understood that these funds would be used to finance Phase II of the Quintero development.
>
> 10. McClung told the Van Weelden Plaintiffs that if they retained the Membership for three years, it would yield a return of 16%-18%.

Hillcrest Bank joined in, already having a relationship with McClung and knowing that previous loans were in distress because of McClung's misconduct. These specifics are set forth in allegations 23-34 of the FAC:

> 23. When Old Standard publicly announced that it was unable to service its debt, McClung, even though he had a long standing relationship with Hillcrest, approached Washington United Life Assurance Company (WULA) and secured more than Fifteen Million Dollars ($15,000,000.00) for the continuation of the Quintero development.
>
> 24. McClung began soliciting investors and when he received funds from them, would pay off previous investors.
>
> 25. On March 2, 2004, courts in Arizona, Washington and Idaho issued rehabilitation orders for three banks: Old West Annuity and Life Insurance Company (domicile state – Arizona), Old Standard (domicile state – Idaho) and WULA (domicile state – Washington). These three companies were affiliates of the so-called Metropolitan Mortgage Group of companies which were in bankruptcy proceeding in Washington.
>
> 26. Hillcrest knew about WULA's financial instability and the dealings McClung had with the predecessor companies. Hillcrest

knew and was concerned about the Washington State Insurance Commission investigation of the various companies.

27. On December 2, 2004 a WULA representative met with McClung and his son Steve McClung at Quintero. The representative took pictures of the water treatment plant under construction and told Steve McClung that WULA was very interested in financing Phase 2 of Quintero, but was concerned that lots were not being sold.

28. Hillcrest did not conduct its due diligence to determine if the proposed development and sale of lots could support the anticipated debt service.

29. Hillcrest did not request any documentation from McClung which accompanied his application to Old Standard or WULA.

30. Hillcrest did not request any information from McClung to explain WULA's continued lateness in meeting loan draw payment dates.

31. Hillcrest did not request information from McClung, for example, that would have shown that McClung had been soliciting and receiving investors' money, repaying previous investors, failing to make loan payments and as a result, experiencing delayed loan draw payments from WULA.

32. When Hillcrest became aware of WULA and its financial difficulties, rather than obtaining participant banks to share in the financing as it had represented to McClung, it decided to increase the previously slashed budget proposals submitted by McClung so that the line of credit was sufficient to cover the financial assurances necessary to satisfy the Arizona Department of Real Estate (ADRE) and pay off the WULA loan.

33. On March 8, 2005, Hillcrest finalized a line of credit to Quintero for Thirty-One Million One Hundred Thirty-Four Thousand Dollars ($31,134,000.00). This amount was calculated to pay off the WULA outstanding balance of Ten Million Six Hundred Eighty-Four Thousand Eight Hundred Twenty-Eight and 02/100 Dollars ($10,684,828.02), fees to First American Title Company (FATCO) of Sixty-One Thousand Five Hundred Twenty-Three and 59/100 Dollars ($61,523.59), fees to Hillcrest for approximately Three Hundred Sixty Thousand Dollars ($360,000.00), legal fees of approximately Fifty Thousand Dollars ($50,000.00) and the pay off of other Quintero, McClung and Hillcrest loans.

> 34.     The Line of Credit included paying off McClung's personal loan obligations, ADRE financial assurances of Sixteen Million One Hundred Eight Thousand Six Hundred Forty Dollars ($16,108,640.00) and an advance made on the loan to McClung for One Hundred Three Thousand One Hundred Sixty-Eight Dollars ($103,168.00).

Hillcrest doomed the development to fail by structuring the loan in a way that the funding would be insufficient to cover the cost of development.  This is set forth in allegations 11-21 of the FAC:

> 11.     In June 2004, McClung personally, and as a representative of Quintero Golf & Country Club, began negotiating with Hillcrest Bank of Kansas City (Hillcrest) to procure a loan to complete the in-progress and contemplated improvements of the Quintero Community in Arizona.
>
> 12.     Hillcrest indicated that it needed to add other banks or lenders to share the financing burden in order to achieve the development goals of the Quintero Community, including construction of a clubhouse.
>
> 13.     Hillcrest assured McClung that it was able to obtain other participant banks. Based upon this assurance, McClung began the loan documentation process of Hillcrest.  Hillcrest did not obtain any such participant banks to share in the financing burden.
>
> 14.     Hillcrest requested a budget proposal from McClung for the purpose of establishing whether it would be prudent to fund the Quintero development.
>
> 15.     McClung submitted a proposal on September 21, 2004 totaling Twenty-Nine Million Eight Hundred Seventy-One Thousand Sixty-Three Dollars ($29,871,063.00), which included Twenty-One Million One Hundred Sixty Thousand Sixty Dollars ($21,160,060.00) in hard costs and Four Million Eight Hundred Fourteen Thousand Seven Hundred Seventy-Eight Dollars ($4,814,778.00) in soft costs.
>
> 16.     Hillcrest rejected the proposal and demanded that all the soft costs be eliminated from the proposal.  The soft costs included engineering consultants, survey consultants, construction administration, construction management, planning and

construction documents, Phase 2 planning and engineering and marketing for the entire project.

17. Hillcrest demanded and McClung agreed that all amounts which were not funded according to a final budget proposal in the form of a line of credit, would be privately funded by McClung.

18. McClung submitted a second proposal in January 2005, which itemized hard costs totaling Twenty Million Five Hundred Eighty Thousand Five Hundred One Dollars ($20,580,501.00) and, despite Hillcrest's directive to the contrary, soft costs of One Million Seven Hundred Ninety- Nine Thousand Seven Hundred Fifty-One Dollars ($1,799,751.00).

19. Hillcrest rejected the second proposal and again demanded the elimination of the soft costs from the budget.

20. McClung submitted a third budget proposal which itemized hard costs totaling Nineteen Million Sixty- One Thousand Three Hundred Thirty-One Dollars ($19,061,331.00) and no soft costs. At Hillcrest's request, McClung reduced the 15% contingency to 10%. The grand total of the third budget proposal was Twenty Million Nine Hundred Sixty-Seven Thousand Four Hundred Sixty-Four Dollars ($20,967,464.00).

21. Hillcrest again rejected the proposal and McClung submitted a fourth one in February 2005. This one itemized Seventeen Million Six Hundred Fifty- Two Thousand Six Dollars ($17,652,006.00) in hard costs with a 10% contingency of One Million Seven Hundred Sixty-Five Thousand Two Hundred One Dollars ($1,765,201.00) for a total of Nineteen Million Four Hundred Seventeen Thousand Two Hundred Six Dollars ($19,417,206.00). This did not end the process.

Van Weeldens incorporated 160 allegations into their count for civil conspiracy. Van Weeldens have appropriately pled the facts and legal elements of civil conspiracy.

## III.   CONCLUSION

Injunctive relief has already been granted in this case and confirmed by the state court judge; Defendant is forum shopping. The allegations in Plaintiffs' First Amended Complaint are specific and support all of the counts asserted. The First Amended Complaint contains

abundantly specific allegations and incorporates all of the 120 general allegations into each count.  Defendant's Motion to Dismiss should be denied.

RESPECTFULLY SUBMITTED this 30th day of September, 2010.

**J. JEFFREY COUGHLIN PLLC**

By:   /s/ J. Jeffrey Coughlin
J. Jeffrey Coughlin
Attorneys for Plaintiffs

COPY of the foregoing
mailed this 30th day of
September, 2010 to:

Kevin M. Judiscak
Scott W. Hulbert
ENGELMAN BERGER, P.C.
3636 North Central Avenue, Ste. 700
Phoenix, AZ 85012
Attorneys for Defendant

By:   /s/ C. Padilla